UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| CRAIG SMITH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   1:18-cv-00294-JDL |
| | ) |
| DAEDONG-USA, INC., | ) |
| | ) |
| Defendant. | ) |

**ORDER ON MOTIONS TO PRECLUDE TESTIMONY AND
MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

Craig Smith brings this products liability action against Daedong-USA, Inc., for injuries he sustained when his right leg became trapped in the blades of a snowblower attachment to a tractor manufactured and sold by Daedong. Both Smith and Daedong have retained expert witnesses in this litigation, and both parties move to preclude all or a portion of the opposing expert's testimony under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) (ECF Nos. 44, 48). Additionally, Daedong moves for partial summary judgment (ECF Nos. 42, 45). A hearing was held on all pending motions on February 10, 2020.

**I. BACKGROUND**

Smith's filings reflect the following facts. On February 10, 2014, Smith's father purchased a tractor and snowblower attachment from a tractor dealer in Caribou, Maine. He later lent the tractor and snowblower attachment to Smith. On the morning of December 29, 2015, Smith was using the tractor on his property with the snowblower attachment. The tractor supplied power to the snowblower through what is known as a Power Take-Off device. Shortly after Smith began plowing snow, he

got off the tractor, but he did not disengage the Power Take-Off device and thus did not shut off the snowblower. To protect operators under these circumstances, the tractor was equipped with an Operator Presence Control System, a safety feature that is intended to automatically cut off the power supply to snowblowers and other attachments when an operator gets off a tractor without first disengaging the Power Take-Off device. However, the Operator Presence Control System did not perform this function here, and the snowblower continued running after Smith left the tractor's seat. Soon after getting off the tractor, Smith slipped and fell, and his right leg became trapped underneath the still-rotating auger blades of the snowblower. He sustained severe and permanent injuries to his right leg and ankle. About two years after the accident, the tractor was sold to a new owner.

Smith contends that the Operator Presence Control System failed to perform as intended and caused his injuries because of a manufacturing or design defect in the system. Daedong asserts that the Operator Control Presence System did not perform as intended because Smith or Smith's father intentionally bypassed it, causing the injury to Smith. Both parties have retained expert witnesses to testify as to the possible causes of Smith's injuries, and both parties move to exclude some or all of the opinions offered by the opposing party's expert.

## II. DISCUSSION

### A.   Daedong's *Daubert* Motion

Daedong moves to preclude Smith's expert, Jody Knowles, from testifying about the Operator Presence Control System on Smith's tractor and the possible causes of Smith's injuries. Daedong argues that Knowles is not qualified to testify as

2

an expert and further contends that Knowles' testimony is inadmissible because it is unreliable.

### 1. Expert Qualifications

Knowles has a bachelor's degree in mechanical engineering. He owns a company that designs and manufactures tilt sensors, which are devices that shut off electrical circuits when a machine has tilted beyond the point at which it can safely operate. Prior to starting his business, Knowles worked in an engineering capacity as a project manager for housing developments and as a design engineer for a manufacturer of industrial controls. Additionally, Knowles has personal experience repairing snowmobiles and automobiles and operating tractors with and without snowblower attachments. Daedong asserts that Knowles' background does not qualify him to testify as an expert because he has "[n]ever been professionally involved in the design or selection of tractor seats or seat safety switches" and thus has no experience with the components of the Operator Presence Control System at issue. ECF No. 44 at 4.

"[T]he First Circuit has expressly rejected the proposition that an expert providing testimony regarding the safety design of a machine must have experiences with that particular machine." *Wyman v. Yates-Am. Mach. Co.*, No. 1:13-cv-00300-JAW, 2016 WL 6441006, at *10 (D. Me. Oct. 31, 2016) (citing *DaSilva v. Am. Brands, Inc.*, 845 F.2d 356, 361 (1st Cir. 1988)). Accordingly, an expert witness was qualified to testify in a case regarding golf cars based on his mechanical engineering degrees and experience because he had "worked with mechanical designs and safety engineering for decades." *Perez-Garcia v. P.R. Ports Auth.*, No. 08-1448 (GAG), 2012

WL 12552257, at *3 (D.P.R. July 5, 2012). The witness did not need "vast experience in the golf car industry" to qualify as an expert. *Id.* "His lack of previous experience with golf cars" was relevant to "the weight of his testimony rather than his ability to testify as an expert." *Id.* Similarly, an expert witness was qualified in a separate case to testify about the safety of electrical dryers even though he lacked detailed expertise regarding electrical dryers. *See One Beacon Ins. Co. v. Electrolux*, 436 F. Supp. 2d 291, 299 (D. Mass. 2006) (citing *Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 80 (1st Cir. 2004) and *DaSilva*, 845 F.2d at 361).

Thus, Knowles' education and experience as a mechanical engineer qualify him to testify as to the safety and the design of the tractor seat and seat switch at issue, despite his lack of experience designing tractor seats and seat switches specifically. His experience repairing tractors and operating tractors and snowblowers further qualifies him to testify about how tractors and snowblowers work in practice.

### 2. Reliability

Daedong further argues that Knowles' testimony should be excluded because his opinions are conclusory and therefore unreliable. To determine whether an expert's testimony is sufficiently reliable, "a district court must determine whether it is 'based on sufficient facts or data,' [whether it] was 'the product of reliable principles and methods,' and whether the expert 'reliably applied the principles and methods to the facts of the case.'" *Packgen v. Berry Plastics Corp.*, 847 F.3d 80, 85 (1st Cir. 2017) (quoting Fed. R. Evid. 702). "Exactly what is involved in 'reliability' . . . must be tied to the facts of a particular case." *Id.* (alteration in original) (quoting *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 14–15 (1st Cir. 2011)).

Where, as here, an expert's opinion is based on "personal experience," the expert must explain "how his 'experience led to the conclusions reached, why that experience was a sufficient basis for that opinion, and how that experience was reliably applied to the facts.'" *Brown v. Wal-Mart Stores, Inc.*, 402 F. Supp. 2d 303, 310 (D. Me. 2005) (alterations omitted) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment); *see also id.* at 308. "The object of *Daubert* is 'to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Milward*, 639 F.3d at 15 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

Smith asserts that Knowles can both reliably explain how the Operator Presence Control System is intended to function and reliably opine as to multiple possible causes of Smith's injuries. I address the reliability of Knowles' explanation of the Operator Presence Control System before turning to his opinions regarding the possible causes of Smith's injuries.

### a. Explanation of the Operator Presence Control System

Knowles is expected to testify to the following: The Operator Presence Control System consists of a foam seat cushion hovering above an electrical plunger switch (the "seat switch"), which is mounted on a metal seat pan. When the operator sits on the foam seat, the weight of the operator shifts the seat switch into the "down" position, activating an electrical circuit that permits the tractor's Power Take-Off device to supply power to the snowblower attachment. When the operator leaves the seat, the seat switch returns to the "up" position, breaking the circuit and cutting off

5

power to the snowblower attachment. Thus, even if the operator forgets to shut off the Power Take-Off device manually, power to the snowblower is automatically cut off when the operator leaves the seat, preventing the kind of accident that occurred in this case.

Daedong does not dispute this explanation of the Operator Presence Control System but objects that Knowles cannot reliably testify about how the system is intended to function because he did not personally disassemble the seat switch installed in the tractor and thus does not have "any actual knowledge about the switch in question." ECF No. 59 at 1. However, as Smith contends, the seat switch is only one component of the Operator Presence Control System, and each component interacts with the others to make the system function properly. The interaction of these component parts does not depend on the internal design of the seat switch. Thus, Knowles's failure to disassemble the seat switch and examine its internal design does not disqualify him from testifying about how the Operator Presence Control System is intended to function. Rather, Knowles' general testimony about the Operator Presence Control System is admissible, given that it is based on his visual inspection of the tractor at issue, his disassembly of the seat at issue, his personal experience owning and operating two tractors with similar seat switches, and his mechanical engineering background.

        **b.**    **Opinion that water, ice, or snow could have accumulated around the seat switch and caused Smith's injuries**

In order to develop an opinion about whether any defects on Smith's tractor could have caused Smith's injuries, Knowles disassembled and examined the seat

6

from Smith's tractor. During the examination, Knowles observed that the seat switch was located in a hole in the seat pan, and he found that water had likely drained out of the seat pan through that hole. He further found that there were no other significant pathways for water to drain out of the seat pan. He compared these observations with the manufacturer's specifications and discovered that several drain holes called for in the specifications were missing from the seat pan on Smith's tractor. Knowles also noticed during his examination of the seat that both the seat switch and the seat pan were rusty. Based on his examination, Knowles concluded that moisture was likely to accumulate and had previously accumulated around the seat switch, which was not waterproof or sealed against moisture.

     Knowles opines that an accumulation of moisture around the seat switch could have caused either an electrical or mechanical malfunction in the Operator Presence Control System on the date of Smith's accident. As explained above, when the system functions properly, the weight of the operator on the foam seat shifts the seat switch into the "down" position, activating an electrical circuit that allows power to be conducted to the snowblower. When the operator leaves the foam seat, the seat switch shifts into the "up" position, breaking the circuit and cutting off power to the snowblower.

     An electrical malfunction in the system would mean that the seat switch itself performed as intended on the date of Smith's accident, returning to the "up" position after Smith left the driver's seat, but that the circuit erroneously remained activated, allowing the snowblower to continue operating. Knowles opines that this kind of electrical malfunction could have occurred if the seat switch was surrounded by

7

moisture. He explains that water conducts electricity and thus could have caused electricity to continue flowing through the circuit even after the seat switch shifted into the "up" position.

While this opinion appears reliable on its face, it fails upon closer inspection. When Knowles was asked at his deposition to specifically describe how an electrical malfunction could have occurred in Smith's tractor on the date in question, Knowles testified that he could not answer because, while he had disassembled and examined the seat from Smith's tractor, he had not disassembled or tested the seat switch. Because Knowles admitted that he did not conduct the disassembly and testing necessary to explain how an electrical malfunction could have occurred, his opinion that an electrical malfunction could have caused Smith's injuries is speculative. In other words, even if Knowles' opinion is based on his experience working with electrical circuits and switches, Knowles has failed to establish that he reliably applied that experience to the facts of this case, as required by *Daubert*. *See Brown*, 402 F. Supp. 2d at 310. Accordingly, Knowles' opinion that an electrical malfunction could have caused Smith's injuries is inadmissible.[1]

Setting aside the electrical-malfunction theory, Knowles also opines that an accumulation of moisture around the seat switch could have caused Smith's injuries by causing a mechanical malfunction in the Operator Presence Control System. A mechanical malfunction would mean that the seat switch erroneously remained in

---

[1] Although *Daubert* does not necessarily require experts to test their theories, it does require experts to offer reliable opinions. *See Quilez-Velar v. Ox Bodies, Inc.*, 823 F.3d 712, 719 (1st Cir. 2016). Here, Knowles admitted that disassembly and testing of the seat switch would be necessary for him to form a reliable opinion, as stated above. Under these circumstances, Knowles' failure to disassemble and test the seat switch is dispositive.

the "down" position after Smith left the driver's seat, causing the electrical circuit to remain activated and allowing the snowblower to continue operating. Knowles opines that the seat switch could have gotten stuck in the "down" position and caused such a malfunction if water accumulated and then froze in or around the seat switch, or if snow accumulated and blocked the seat switch from returning to the "up" position.[2]

Daedong challenges Knowles' opinion that moisture could have caused a mechanical malfunction because Knowles did not conduct any scientific testing to validate his theories. However, testing is not required for an expert's testimony to be admissible under Rule 702 and *Daubert*. *See Quilez-Velar*, 823 F.3d at 719. Rather, as noted above, an expert relying primarily on his experience need only explain "how his experience led to the conclusions reached, why that experience was a sufficient basis for that opinion, and how that experience was reliably applied to the facts." *Brown*, 402 F. Supp. 2d at 310 (alterations omitted) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment). Neither party appears to have based their questioning during Knowles' deposition on the standard set forth in *Brown*, and neither party sufficiently addressed the application of that standard in their filings or at oral argument. As such, the record is not sufficient for me to determine the admissibility of Knowles' opinion that an accumulation of moisture around the seat switch could have caused a mechanical malfunction in the Operator Presence Control

---

[2] Daedong challenges Knowles' opinion that snow could have accumulated in the seat pan and around the seat switch. However, I find this opinion sufficiently reliable based on Knowles' testimony that his visual inspection of the seat revealed several possible pathways for snow to get into the seat pan and his testimony that, in his personal experience using snowblowers, snow predictably works its way into every opening. *See* ECF No. 41-61 at 11.

System. Thus, I conclude that an evidentiary hearing, at which Knowles will be subject to questioning by both parties and the Court, is necessary.

        **c.     Opinion that an alternative design is safer for use in wet, snowy, icy, or cold conditions**

In addition to opining that the Operator Presence Control System in Smith's tractor was vulnerable to moisture and thus could have malfunctioned and caused Smith's injuries in the ways discussed above, Knowles offers opinions about the safety and design of a newer tractor model distributed by Daedong. When Knowles disassembled and examined the seat on the newer model, he observed several differences between Smith's tractor seat and the newer model. First, he found that in the newer model, the hole in which the seat switch is mounted is located on a "hill," i.e., a portion of the seat pan that is elevated above the rest, permitting water to drain away from the seat switch. By contrast, the same hole in Smith's model was not elevated. Second, Knowles observed that the newer model incorporates twenty-one drain holes designed specifically for water to flow out of the seat pan, whereas Smith's seat had no drain holes other than the hole in which the seat switch was mounted. Finally, he noted that a cap similar to an umbrella protects the seat switch in the newer model from moisture, whereas the design of the seat switch in Smith's tractor did not incorporate a protective cap. Based on these differences, Knowles opines that moisture is less likely to accumulate around the seat switch in the newer model.

In developing his opinion about the design and relative safety of the newer model, Knowles also reviewed marketing brochures from the company that manufactured the seat switches in both Smith's tractor and the newer model. The brochures indicate that the seat switch in Smith's tractor is "unsealed." The

10

brochures do not indicate whether the newer model's seat switch is sealed or unsealed, but they do state that it is suitable for "outdoor" environments. By contrast, the brochures designate the unsealed seat switch in Smith's tractor as suitable only for "rugged" environments, not "outdoor" environments. Based on this information and his experience selecting and ordering parts for the tilt sensors he designs for his company, Knowles opines that the seat switch incorporated into the newer model is likely sealed. Thus, Knowles suggests that the Operator Presence Control System in the newer model is less likely to malfunction in the presence of moisture than the Operator Presence Control System in Smith's tractor.

Daedong moves to exclude Knowles' opinion that the seat switch installed in the newer model is sealed, arguing that marketing brochures are not "sufficient facts or data" on which an expert opinion may be based. Daedong also suggests that Knowles' opinion is not based on reliable principles and methods because Knowles did not conduct any testing on the two switches or contact the manufacturer to determine whether they were sealed. While scientific testing is not necessarily required to establish reliability, *see Quilez-Velar*, 823 F.3d at 719, Smith must establish that Knowles' reliance on the marketing brochures alone matches the "level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Milward*, 639 F.3d at 15 (quoting *Kumho Tire*, 526 U.S. at 152). Relatedly, Smith must establish that Knowles can explain "how his experience led to the conclusions reached, why that experience was a sufficient basis for that opinion, and how that experience was reliably applied to the facts." *Brown*, 402 F. Supp. 2d at 310 (alterations omitted) (quoting Fed. R. Evid. 702 advisory committee's note to 2000

amendment). Here, as above, neither party has sufficiently addressed these requirements, and Knowles must be questioned further before I can determine the admissibility of his opinion that the seat switch in the newer model is sealed.[3]

### d. Opinion that the foam seat could have malfunctioned in cold weather and caused Smith's injuries

In addition to his opinions relating to moisture accumulation around the seat switch, Knowles offers an opinion relating to the foam material in the seat of Smith's tractor. Knowles testified that he knows from his personal experience operating tractors that foam seats are slow to regain their shape after the operator leaves the seat, and there is some evidence in the record that foam seats are rigid in cold weather. Knowles also estimated, based on his examination of Smith's tractor seat, that two pounds of pressure applied to the foam seat were likely sufficient to shift the seat switch into the "down" position, activating the electrical circuit that allows power to continue flowing to the snowblower. Based on his personal experience and his examination, Knowles opines that the foam seat on Smith's tractor could have remained depressed after Smith left the seat and thus could have continued exerting enough pressure to keep the seat switch in the "down" position, causing Smith's injuries.

However, Knowles does not explain how the foam seat would have exerted two pounds of pressure on the seat switch without the weight of the operator on top of it.

---

[3] Daedong also attacks the reliability of Knowles' opinion by pointing to the testimony of its own expert witness, Ivan Collins, who concluded after testing that the seat switch used in the newer model tractor is not sealed. However, Collins' competing testimony goes to the weight, not the admissibility, of Knowles' opinion: "[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quilez-Velar*, 823 F.3d at 720 (quoting *Daubert*, 509 U.S. at 596).

Instead, Knowles simply assumes that the foam seat would have continued exerting some residual pressure after Smith dismounted, and that such residual pressure would have exceeded two pounds, based on the evidence that foam seats are rigid in cold weather.[4]  Because Knowles does not explain how the rigidity of the foam seat corresponds to pressure exerted on the seat switch, "there is 'too great an analytical gap between the data and [his] opinion'" that the foam seat could have caused Smith's injuries.  *Milward*, 639 F.3d at 15 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).  Accordingly, I conclude that this opinion is unreliable and inadmissible under *Daubert*.

### e. Conclusion as to Jody Knowles' Testimony

For the foregoing reasons, Daedong's motion to exclude Knowles' testimony is denied as to his opinion about how the Operator Presence Control System is intended to function.  The motion is granted as to Knowles' opinions about how an accumulation of moisture around the seat switch could have caused an electrical malfunction and about how the foam material of the seat could have caused Smith's injuries.  Pending an evidentiary hearing at which Knowles will be subject to further questioning by the parties and the Court, I defer ruling on the admissibility of Knowles' opinions about how an accumulation of moisture around the seat switch could have caused a mechanical malfunction and about how an alternative design is less likely to malfunction in the presence of moisture.

---

[4] Although Knowles also noted that he knows from personal experience that foam seats absorb water, he did not indicate that a hypothetical accumulation of water in Smith's seat could have exerted the necessary two pounds of pressure.

**B.     Smith's *Daubert* Motion**

For his part, Smith moves to exclude four opinions offered by Daedong's expert, Ivan Collins, who is qualified to offer expert testimony based on his bachelor's degree in mechanical engineering, his professional mechanical engineering license, and his more than twelve years' experience working as an engineer and conducting failure analyses in personal injury cases.  I address each challenged opinion in turn.

**1.     Opinion regarding bypasses of other features on the tractor**

First, Smith moves to exclude Collins' opinion that, "[b]ased on the fact that [Smith] had bypassed other safety features on the tractor and snow blower, the most likely cause of the 'failure' of the seat switch was that it was bypassed . . . ." ECF No. 41-47 at 15.  The other features Collins refers to are the tractor's rollover protection system, neutral safety harness, and shear bolts.  Even assuming that Smith or his father was responsible for bypassing these other features,[5] Collins testified that these bypasses would not have affected the seat switch's performance on the date of the accident or otherwise caused Smith's injuries.  Collins did not offer any testimony indicating that a person who knew how to bypass these other features would also know how to bypass the Operator Presence Control System.  Nor did he testify that a person who had been motivated to bypass the other features would be similarly

---

[5] Both Smith and his father averred in sworn affidavits that they did not know how to bypass the neutral safety harness and did not do so, suggesting that the neutral safety harness must have been bypassed by the tractor's new owner after the tractor was sold in December 2017.  By contrast, the dealer who sold the tractor to Smith's father testified that he believed Smith or Smith's father must have been responsible for the bypass of the neutral safety harness.  Collins testified that he chose to credit the dealer's testimony over the Smiths' affidavits because he did not believe the dealer had an interest in the outcome of this case.  Because Collins relied on a personal, non-scientific judgment about the credibility of the dealer's testimony and the Smiths' affidavits, his opinion that Smith or Smith's father byassed the neutral safety harness is  inadmissible under Rule 702 and *Daubert*.  *See infra* Part II.B.2.

14

motivated to bypass the Operator Presence Control System. Thus, as Smith argues, Collins' opinion that Smith likely bypassed the Operator Presence Control System is at least partially based on a non-scientific propensity inference about Smith's likely behavior on the date in question.

Daedong does not dispute that Collins relied on a propensity inference, but contends that the opinion is nevertheless reliable because the propensity inference was the product of the scientific method described in Chapter 4 of the 921 Guide for Fire and Explosion Investigations issued by the National Fire Protection Association ("NFPA 921"). Daedong points out that NFPA 921 requires investigators to use "common sense" to determine the cause of a fire or explosion. ECF No. 49 at 6, 13. However, there is no evidence that the NFPA 921 is a reliable scientific method to apply in this case, which does not involve a fire or an explosion. While Daedong asserts that NFPA 921's principles "are equally applicable as an appropriate scientific methodology for failure analysis . . . where a loss may have been caused by a product failure due to a defect," ECF No. 49 at 6, Daedong does not identify any authority supporting this proposition. In fact, no court in this Circuit has recognized NFPA 921 as a reliable method outside the context of a fire or explosion.

Further, as Smith argues, NFPA 921 does not displace the requirements of Rule 702 and *Daubert*. As discussed above, experts may testify under Rule 702 only if their "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). "Expert testimony does not assist where the trier of fact has no need for an opinion because it easily can be derived from common sense, common experience, the trier of fact's own perceptions,

15

or simple logic." *United States v. Zajanckauskas*, 441 F.3d 32, 39 (1st Cir. 2006) (alterations omitted) (quoting 29 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure § 6264 (2d ed. 2005)). Thus, to the extent that Collins bases his opinion on a propensity inference, and not on his specialized knowledge as an engineer, the opinion is inadmissible under Rule 702 and *Daubert*.[6]

### 2. Opinion that Smith was shoveling snow into the snowblower

Second, Smith challenges Collins' opinion that Smith was intentionally shoveling snow into the rotating blades of the snowblower when the accident occurred. In forming this opinion, Collins relied on the testimony of the dealer who sold the tractor to Smith's father. The tractor dealer testified that he had heard from Smith's father that Smith was injured while trying to shovel snow into the snowblower. By contrast, Smith testified that he was clearing snow from animal feed bowls when he slipped and fell under the snowblower. Collins credited the dealer's testimony over Smith's testimony because he believed Smith had "an extreme interest the case" but did not understand what interest the dealer might have in the case. ECF No. 41-43 at 191. Collins did not offer any basis for his opinion beyond his judgment that the dealer's testimony is more credible than Smith's.

Smith objects that Collins' opinion is inadmissible because it is based on a personal, non-scientific credibility judgment. Daedong responds, as above, that the credibility judgment was not only permissible but required by the scientific method described in NFPA 921, which provides that investigators should "make

---

[6] Smith also argues that this opinion should be excluded under *Daubert* and Rule 403 because the propensity inference that Collins drew would ordinarily be prohibited by Fed. R. Evid. 404(b). I need not address this issue because Collins' opinion is inadmissible for the reasons stated above.

16

determinations about the reliability of any information obtained including witness statements." ECF No. 49 at 6. Under NFPA 921, investigators evaluate reliability based on "common sense[,] personal knowledge and experience, the information source's reputation, and the information source's particular interest in that investigation." *Id.* (alteration omitted). However, even assuming NFPA 921 is applicable, it does not displace the requirements of Rule 702 and *Daubert*, as discussed above. Because Collins' opinion is based solely on a common-sense credibility judgment that is well within the grasp of a lay jury, I conclude that Collins' opinion will not assist the trier of fact and is therefore inadmissible. *See Zajanckauskas*, 441 F.3d at 39.[7]

### 3. Opinion about how Smith could have avoided injury

Third, Smith moves to exclude Collins' opinion that, "had [] Smith heeded the warnings, instructions in the Tractor manual, instructions in the snow blower manual, and had typical situational awareness for an operator of a tractor and snow blowing equipment[,] this incident would not have occurred." ECF No. 41-47 at 15. Collins bases this opinion on his review of the relevant warnings and manuals, as well as on Smith's deposition testimony. Smith asserts that this opinion is not, on its face, based on Collins' specialized knowledge as a mechanical engineer. As such, Smith contends that the jury is as competent as Collins to read the relevant warnings and manuals, evaluate Smith's testimony, and assess Smith's situational awareness.

---

[7] Smith also asserts that the opinion should be excluded under *Daubert* and Rule 403 because the testimony that Collins relied on contains inadmissible hearsay. I need not address this issue because Collins' opinion is inadmissible for the reasons stated above.

Accordingly, Smith argues, this opinion will not help the jury determine the cause of the accident.

Daedong responds that Collins' opinion is based on his specialized knowledge and that it would be helpful to the trier of fact because it is the product of the scientific method described in NFPA 921. However, as discussed above, Daedong has not established that NFPA 921 is a reliable method to apply in this case or that its application necessarily involves specialized knowledge. Absent evidence that Collins' opinion is informed by his mechanical engineering expertise and is the product of reliable principles and methods, I conclude that the opinion will not assist the trier of fact and is therefore inadmissible under Rule 702 and *Daubert*.

### 4. Opinion that Smith must have been aware that the snowblower was operating before he was injured

Finally, Smith challenges the reliability of Collins' opinion that the sound of the snowblower "would have been clearly noticeable" to Smith after he left the driver's seat of the tractor. ECF No. 41-47 at 15. As explained above, to determine whether an expert's testimony is sufficiently reliable, a district court must determine whether it is based on sufficient facts or data, whether it was the product of reliable principles and methods, and whether the expert reliably applied the principles and methods to the facts of the case. *See Packgen*, 847 F.3d at 85 (quoting Fed. R. Evid. 702).

In forming this opinion, Collins conducted sound-level testing on Smith's tractor and found that there is a seven-decibel difference between the sound of an idling tractor with the Power Take-Off device engaged and the sound of an idling tractor with the Power Take-Off device disabled. Citing scientific literature

18

indicating that a change in volume of five decibels or more is "clearly noticeable," ECF No. 41-47 at 10–11, Collins opines that the seven-decibel difference he measured would have been clearly noticeable to Smith on the date of the accident. However, the record does not indicate that the seven-decibel change in volume Collins measured would have occurred on the date in question. Instead, the record suggests that the volume would have remained constant, as the Power Take-Off device on Smith's tractor remained engaged both before and after Smith left the driver's seat. Collins did not attempt to explain how his findings about the noticeability of a seven-decibel change in volume apply to circumstances where no change in volume occurred. Nor did Collins offer any scientific facts or data about the noticeability of the absence of a change in volume. Thus, I find that Collins did not reliably apply the sound-level testing and scientific literature to the facts of this case. Accordingly, this opinion is inadmissible under Rule 702 and *Daubert*.[8]

### 5. Conclusion as to Ivan Collins' Testimony

For the foregoing reasons, Smith's motion to exclude certain of Collins' opinions is granted in all respects.

### III. CONCLUSION

For the reasons explained above, it is **ORDERED** that Daedong's motion to preclude the testimony of Jody Knowles (ECF No. 44) is **GRANTED IN PART**, as to Knowles' opinions about how an accumulation of moisture around the seat switch

---

[8] Smith also argues that Collins is not qualified to offer an opinion about sound levels because he is a mechanical engineer, not a sound engineer. Daedong did not respond to this argument in its opposition brief. Because the opinion is inadmissible for the reasons explained above, I need not address this issue.

19

could have caused an electrical malfunction and about how the foam material of the seat could have caused Smith's injuries, and **DENIED IN PART**, as to his explanation of how the Operator Presence Control System is intended to function. I defer ruling on the remaining aspects of Daedong's motion to preclude the testimony of Jody Knowles (ECF No. 44) pending an evidentiary hearing to be scheduled by the Clerk. Accordingly, I also defer ruling on Daedong's motions for partial summary judgment (ECF Nos. 42, 45).

It is further **ORDERED** that Smith's motion to exclude certain opinions of Ivan Collins (ECF No. 48) is **GRANTED**.

**SO ORDERED.**

**Dated:  June 26, 2020**

                                          /s/ JON D. LEVY
                                          **CHIEF U.S. DISTRICT JUDGE**